[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] Ruling on Application for Temporary Injunction
In this case, the plaintiffs, three environmental organizations and a New York State Assemblyman, seek a temporary injunction prohibiting the defendant Commissioner of Environmental Protection from transferring a water discharge permit from defendant Northeast Nuclear Energy Company ("NNEC"), the current operator of the Millstone Nuclear Power Station in Waterford, to defendant Dominion Nuclear Connecticut, Inc. ("DNC"), an entity scheduled to purchase Millstone on March 30, 2001. The court held a hearing on the application on March 27 and 28, 2001. For the reasons stated below, the application for a temporary injunction is denied.[1]
DISCUSSION
Our Supreme Court has identified the following factors as relevant to the decision on an application for a temporary injunction: 1) the probability of success on the merits, 2) the irreparability of any harm unless the status quo is preserved, and 3) the harm sustained by other parties as well as the public from preservation of the status quo. SeeGriffin Hospital v. Commission on Hospitals Health Care, 196 Conn. 451,457-58, 493 A.2d 229 (1985). The court applies these factors in turn.
1. Probability of Success on the Merits
Relying on General Statutes § 22a-16, the Connecticut Environmental Protection Act, the plaintiffs' complaint challenges the validity of the discharge permit, its extension under an Emergency Authorization, and the proposed transfer of the permit from NNEC to DNC. In Fish Unlimited v.Northeast Utilities Service Co., 254 Conn. 21, 755 A.2d 860 (2000) (FishII), our Supreme Court held that the plaintiff environmental groups, some CT Page 4380 of which are plaintiffs in the present case, lacked standing under §22a-16 to challenge the validity of the very same water discharge permit at issue here. The plaintiffs have not advanced any principled basis to conclude that Fish II is not controlling. Thus the express holding ofFish II appears to foreclose the plaintiffs' challenge to the discharge permit itself.
The Fish II Court concluded that the plaintiffs "cannot use § 22a-16
as an `open sesame' to litigate environmental issues that are governed by § 22a-430 [the statute addressing discharge permits], and whichclearly have been placed within the exclusive domain of the department
[of environmental protection]." Id. at 34 (emphasis added). While this conclusion does not specifically address the plaintiffs' additional attack on the emergency authorization and the transfer of the permit, the underscored language logically applies to these matters as well. Because General Statutes §§ 22a-6k and 22a-6o, the statutes governing emergency authorizations and transfers of licenses, do not provide for any right of intervention or any public hearing, these matters are ones that the General Assembly has "placed within the exclusive domain of the department." Fish II at 34. Thus, under Fish II, it would appear that the plaintiffs also lack standing to challenge the emergency authorization and the transfer. Accordingly, it is not probable that the plaintiffs will succeed on the merits of their ultimate claims in this action.
2. Irreparable Harm
While the plaintiffs produced evidence that radioactive materials in discharges from nuclear power plants such as Millstone can, at some level, cause cancer in humans and animals, the plaintiffs failed to demonstrate that any harm will arise solely because of the transfer of the discharge permit, which is the transaction that the plaintiffs seek to enjoin. Indeed, the plaintiffs' witnesses themselves acknowledged that the transfer of the permit to DNC will not affect the nature of the discharges from Millstone.
The evidence established that, although DNC is a new company being formed for the purpose of acquiring Millstone, its parent company, Dominion Resources, Inc., has substantial assets and considerable experience in power generation. Further, the sale of Millstone to DNC has received the approval of numerous governmental agencies, including the Nuclear Regulatory Commission and the Connecticut Department of Public Utility Control. See Connecticut Coalition Against Millstone v. Connecticut Department of Public Utility Control, Superior Court, judicial district of New Britain, Docket No. CV-01-5-6963S (March 26, 2001) (affirming decision of the Department of Public Utility Control).[2] In short, plaintiffs could identify no CT Page 4381 environmental or other harm that will occur if DNC, rather than NNECO, holds the discharge permit.[3]
3. Balance of the Equities
Enjoining the transfer of Millstone will harm the public and the defendants in a variety of ways. Initially, an injunction prohibiting the divestiture of Millstone from NNECO and the actual owner, Connecticut Light and Power Company (CLP), will frustrate the General Assembly's goal of "allow[ing] for the competitive generation of electricity while retaining a regulated distribution system to ensure reliability." General. Statutes § 16-244 (4). One of the means identified by the General Assembly to achieve this goal is for each electric distribution company "to submit its nuclear generation assets to a public auction held in a commercially reasonable manner . . . in order to divest itself of remaining nuclear generation assets." General Statutes § 16-244g(b)(1). In accordance with this legislation, CLP has chosen to divest itself of Millstone. At the public auction, DNC purchased Millstone for $1.3 billion. Because of time limitations in the Millstone purchase and sale agreement, however, a temporary injunction of the March 30 closing may jeopardize the entire sale. If the sale falls through, it may prove difficult to find another buyer ready, willing, and able to purchase a nuclear facility for $1.3 billion or any amount close to that. Thus enjoining the transfer delays, if not derails, the achievement of the important legislative objectives of divestiture and competitive generation of electricity.
Enjoining the transfer will also likely raise costs to the customers of CLP, a category that encompasses a large portion of Connecticut's population. An injunction prohibiting CLP from realizing the proceeds of the $1.3 billion sale of Millstone would prevent CLP from significantly reducing its stranded costs of $700 million, slow efforts to retire its debt, and require CLP to maintain a fund for the ultimate decommissioning of Millstone. These added costs will inevitably redound to the detriment of ratepayers and consumers of electricity.
Finally, a temporary injunction will in fact pose economic harm to both Dominion Resources and CLP. Both companies have spent millions of dollars in transaction costs in preparation for the scheduled closing and justifiably expect to realize the benefit of those expenditures.
A temporary injunction of the transfer will thus risk harm to legislative goals, to many Connecticut consumers of electric power, and to the power companies themselves. As shown above, the proposed transfer does not create any new harm to the plaintiffs. Accordingly, the balance of equities tips decidedly in favor of the defendants. CT Page 4382
CONCLUSION
All three factors favor the defendants. Accordingly, the court denies the application for a temporary injunction.
It is so ordered.
Carl J. Schuman, Judge, Superior Court